UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| **MARY LEE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| **MAINE PUBLIC EMPLOYEES** | ) | |
| **RETIREMENT SYSTEM,** | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Mary Lee, by and through undersigned counsel, hereby complains against Defendant Maine Public Employees Retirement System as follows:

**INTRODUCTION**

1. This action alleges discrimination against Plaintiff Mary Lee, a first-generation Asian American of Chinese descent. Plaintiff alleges employment discrimination based on her race, color, ethnicity, and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*. ("Title VII"), and the Maine Human Rights Act, 5 M.R.S. § 4571 *et seq*. ("MHRA").

**THE PARTIES**

2. Plaintiff Mary Lee ("Lee") is an individual residing in the Town of Gardiner, County of Kennebec, and State of Maine.

3. Defendant Maine Public Employees Retirement System, also known and hereinafter referred to as "MainePERS," is an independent agency of the State of Maine that administers retirement benefits for employees of the State of Maine.

4. MainePERS has employed more than 50 full time employees for each of 20 or more calendar weeks for the past two years.

## JURISDICTION AND VENUE

5. Prior to filing this Complaint, Lee filed a charge of discrimination with the Maine Human Rights Commission and the EEOC and received a notice of right to sue letter pursuant to 5 M.R.S.A. § 4612, sub-§6 and 4622, sub-§1, ¶ C on or about May 7, 2021.

6. Plaintiff has fully complied with the procedural requirements of 5 M.R.S.A. §4622(1)(A) and 42 U.S.C. §2000e-5.

7. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in the County of Kennebec and State of Maine.

8. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## STATEMENT OF FACTS

9. Mary Lee ("Lee") was born in Hong Kong and immigrated to the United States more than fifty years ago.

10. Growing up in the Boston area, Lee witnessed blatant anti-Asian acts of hatred. Her family's home was vandalized, her grandfather was assaulted, and Lee

heard people use racist hate speech toward her and other Asian American such as "chink" and "slant eyes."

11.  Lee began working for MainePERS in June of 2013 as a Retirement Services Technician, which was later reclassified to a "Pension Associate II."

12.  Throughout her employment, Lee has performed her job well and received generally positive feedback on her performance.

13.  In her 2013 performance review, Lee received feedback that she was "such a pleasure to work with – willing to help out with whatever needs to be done. You get along well with everyone."

14.  In the same 2013 review, MainePERS indicated that Lee was "committed," and she strives to "improve and learn, often taking the initiative to do so all on your own. You use your resources well and we wish we could clone you! Keep up the good work."

15.  The overall evaluation comment for 2013 written by supervisor Deanna Doyle was as follows: "Mary, I cannot tell you how fortunate we feel to have found you. You have definitely proven yourself to be an asset to our Unit, our Department and to this Agency. I recommend you highly for permanent status and welcome you to our MainePERS family!"

16.  Deanna Doyle gave Lee a similarly outstanding review in 2014, indicating that Lee was doing "Great work!" as a "self-starter" who set a "great example for others." Doyle further stated in 2014 that Lee communicated openly, honestly and professionally, she continued to "shine here!" and "no one is more

conscientious with their work time than you are. You are punctual, use your work time wisely, manage your work appropriately. I know I can depend on you."

17. Deanna Doyle highly recommended Lee for a merit increase in 2014, stating: "your positive attitude and work ethic make you a joy to have on our team."

18. In November of 2014, Retirement Services Supervisor Lynn Hancock wrote an email to Lee stating that she received "more fan mail" from a member about Lee's performance. The postcard read as follows: "My experience with Mary was very informative; she was very helpful and certainly professional. She guided me through the process with accuracy and understanding, all the while being very pleasant." Hancock's email further stated: "The fact that our members take the time to provide such great feedback about their experience working with you is a true testament to the stellar customer service you provide. The pride you take in this aspect of your job is clear and very much appreciated. Great work!"

19. Another member with the initials JP provided the following positive feedback about Lee in a postcard: "Mary Lee did a fantastic job with the above process [of filing for retirement benefits]. She answered my questions fully, explained the process efficiently – and most of all – gave me comfort with the big process of this 'retirement income' starting without any snags – Thank You Mary Lee!"

20. Despite her outstanding performance, Lee was subjected to an overt and blatantly discriminatory comment by a MainePERS supervisor in early 2014, who remarked to Lee that: "All Asians are drug dealers," and asked, "Do you sell drugs?"

21. Lee was humiliated and devastated by this comment, because she has visibly Asian features and yellow-toned skin, and MainePERS was aware of her national origin.

22. Lee filed a grievance with the Union and MainePERS Human Resources about this racist comment.

23. Several months after Lee filed her grievance, MainePERS made her working environment even more hostile by criticizing her for leaving the office when there was a delayed opening due to weather. Lee arrived at the office at the normal opening time, unaware that there was a delayed opening. When she learned about the delay, Lee went out to breakfast with two other employees. She marked the time as administrative on her timecard, which she believed was the standard practice during a delayed opening. MainePERS unfairly criticized and questioned Lee about her timecard for this day but said nothing to the other employees who had not complained about race-based discrimination.

24. Lee felt singled out, targeted, and retaliated against regarding the timecard issue, because she had complained about another supervisor's anti-Asian, racist comment.

25. In 2016, Lee again felt uncomfortable and singled out at work because of her race, national origin, ethnicity, and cultural beliefs.

26. Instead of celebrating each employee birthday on the day it occurs, MainePERS has an office policy of choosing one day a month to celebrate all employees whose birthdays occurred since the previous celebration.

27. On August 10, 2016, Lynn Hancock sent around an email explaining the monthly birthday celebration. According to the email, Mary Lee's October 14th birthday would be celebrated in November.

28. In Chinese culture, it is considered extremely taboo and bad luck to celebrate one's birthday after it has passed. This is a cultural belief that Lee felt very strongly about. Therefore, she emailed the following message about her birthday celebration scheduled for November: "Just FYI . . . if this birthday scheduling is going into November, please do not include me in your celebration as [in] our culture we do not celebrate birthday again the next month."

29. In 2017, Lee's husband was diagnosed with terminal cancer. Lee requested and was approved for an unpaid leave of absence to travel with her dying husband, as well as Family Medical Leave to assist him with medical appointments and treatment at home.

30. Lee's coworkers treated her in an abusive and hostile manner for taking the above time off, claiming that she should be fired. One of the coworkers who treated Lee in a harassing and abusive manner for taking a leave of absence was Kim Bumford. Lee complained about Bumford's behavior toward her, but MainePERS did nothing to resolve the situation.

31. Upon information and belief, similarly situated white employees were not treated with such disdain by coworkers for needing FMLA leave, or for requesting an unpaid leave of absence under the MainePERS contract with the Maine State Employees Association.

32. In 2018, the birthday celebration issue came up again when Lee responded to another email from Lynn Hancock about her birthday. On February 22, 2018, Lee wrote to Hancock that, when the birthday list is updated again, she did not want to participate. Lee again explained that, based on her cultural beliefs, "we normally do not celebrate any birthdays" after they have passed.

33. Rather than accommodating Lee's request, Hancock asked her to "reconsider" it, and explained that the birthday celebrations were about building comradery and avoid "division," as an "important part of striving towards become a successful, highly functioning team."

34. Lee told Hancock that her request not to participate in the celebration was based on her culture and upbringing. Hancock responded that she would "give your request some further consideration," but "know that when we adopted the practice, participation was mandatory."

35. Hancock continued to discuss this issue with Human Resources, expressing confusion over whether Lee wanted to sign the birthday cards each month. Lee informed MainePERS she still would like to be able to sign birthday cards for her coworkers. In discussing the issue, Lee's supervisor said she felt "sourness" about Lee's requests.

36. Hancock continued with email correspondence on the birthday issue, acknowledging that she was "grumpy" about it. Hancock's emails contained a retaliatory, hostile tone about Lee's request. MainePERS asked Lee for clarification and Lee responded: "Yes that is correct, I do not want to celebrate <u>my</u> birthday or

take part in planning. But I do want to wish my coworkers a great birthday [smiley face emoji]."

37. Instead of approaching Lee's request regarding birthday celebrations with understanding of or respect for Lee's cultural beliefs, MainePERS treated Lee's request like it was unreasonable and obnoxious, further contributing to the hostile working environment.

38. Following the history set forth above, MainePERS began unfairly criticizing Lee's performance and interaction with members. Whereas Lee had previously been praised for her outstanding customer service, Deputy Executive Director Jim Dusch and others became critical of Lee's interaction with members.

39. The above unfair criticism further contributed to the hostile and abusive working environment Lee experienced at MainePERS.

40. In contrast to the criticism that MainePERS claimed to be getting about Lee, in 2018 she received the following member feedback: "Mary was/is a wonderful representative for the MainePERS. She is extremely knowledgeable, helpful and explained the process in a way that was very understandable. She was very respectful and gave us the time we needed for completion of the necessary forms for [member's] retirement. It is nice to know that outstanding, caring people exist. Thank you Mary for all your help." Another member wrote: "The service was awesome. Thankful for Mary being on top of all paperwork knowledge."

41. On January 15, 2020, a MainePERS employee brought in an Asian treat to celebrate the Chinese New Year.

42. Kim Bumford, one of the several coworkers who had harassed Lee in 2018-2019 for taking an unpaid leave of absence to travel with her terminally ill husband, walked up to the table of Asian food and said in front of other employees: "Can I have one? Will I turn Chinese if I eat one?" and "Do I have to have slant eyes to eat one?"

43. When Lee learned of the shockingly racist comments by Bumford, she was devastated. MainePERS had subjected Lee to an overtly racist and hostile working environment since 2014.

44. Lee figured that the racist remarks by Bumford would lead to Bumford's termination. However, MainePERS simply reprimanded Bumford and then force Lee to continue working with her.

45. On January 23, 2020, Bumford engaged in further behavior that was clearly intended to harass and intimidate Lee. On her first morning back to the office after being disciplined for her racist remarks, Bumford very deliberately walked past Lee's cubicle at least six times in an obviously hostile manner.

46. Lee met with the Executive Director and General Counsel for MainePERS on the afternoon of January 23, 2020. When asked if she was "ok," Lee responded, "no" and explained that she felt repeatedly singled out in the workplace.

47. MainePERS recently informed Lee that a member was critical of his interaction with her on the phone, claiming that Lee was "short" with him. Lee believes that the member was unhappy with her accent, not the level of customer service that she provided.

48. Lee's accent is due to her race, ethnicity, and/or national origin. Upon information and belief, MainePERS has relied on members' criticism of her accent as a reason to accuse her of poor performance.

49. Lee believes she has been treated differently than similarly situated non-Asian employees because of her race, color, ancestry, and national origin.

50. MainePERS has engaged in willful, knowing discrimination against Lee on the basis of her race, color, ethnicity, and national origin.

### COUNT I – DISCRIMINATION IN VIOLATION OF TITLE VII
### (Hostile Work Environment)
### (42 U.S.C. § 2000e-2)

51. Plaintiff repeats, realleges, and incorporates each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

52. As set forth above, Plaintiff is a member of a protected class within the meaning of Title VII based on her race, color, ethnicity, and national origin.

53. Plaintiff was subjected to unwelcome racist remarks and harassment, as set forth more fully above, because of her race, color, ethnicity, and/or national origin.

54. Defendant discriminated against Plaintiff on the basis of her race, color, ethnicity, and national origin by failing to properly investigate and remedy her complaints of a hostile work environment.

55. The harassment to which MainePERS subjected Plaintiff since 2014 was sufficiently severe and pervasive so as to alter the terms and conditions of her employment and create a hostile and abusive work environment.

56. The racist remarks and other harassing conduct described above were both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and Lee did in fact find the conduct hostile and abusive.

57. Employer liability has been established here because MainePERS knew of two instances of race-based discrimination against Plaintiff, with overt hate speech directed at her, but it did not take sufficient corrective action to eliminate the hostile work environment.

58. MainePERS condoned blatantly offensive and overtly racist behavior toward Lee without removing the offenders from the workplace.

59. To the extent that Plaintiff's work performance has suffered over time, any decline in performance is due to the hostile work environment MainePERS has created for Lee.

60. The racist remarks and harassing environment created by MainePERS was of sufficient permanence, with similar subject matter, that the discrimination can be considered a continuing violation of Title VII from 2014 to the present.

61. Recent acts of hate and racism toward Asian Americans have made the history described above all the more intolerable for Lee, both subjectively and objectively.

62. Lee has suffered a tangible, adverse employment action as a result of the hostile work environment described above.

63. As a result of Defendant's conduct, Plaintiff has suffered damages and is entitled to the relief available under Title VII.

**WHEREFORE**, Plaintiff Mary Lee respectfully requests that the Court enter judgment in her favor and against Defendant MainePERS, and award her damages for Defendant's violation of Title VII, including economic, compensatory, liquidated, and punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT II – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5 M.R.S. § 4572)

64. Plaintiff realleges and incorporates by reference the allegations set forth in the paragraphs above.

65. For all the same reasons set forth in Count I above, Plaintiff has suffered discrimination on the basis of her race, color, ethnicity, and national origin in violation of the Maine Human Rights Act.

**WHEREFORE**, Plaintiff Mary Lee respectfully requests that the Court enter judgment in her favor and against Defendant MainePERS and award her damages for Defendant's violation of the MHRA, including economic, compensatory, liquidated, and punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### JURY TRIAL DEMAND

Plaintiff Mary Lee hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated:  August 5, 2021  /s/ Laura H. White

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
[lwhite@whiteandquinlan.com](mailto:lwhite@whiteandquinlan.com)


/s/ *Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
[dquinlan@whiteandquinlan.com](mailto:dquinlan@whiteandquinlan.com)